UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| BRIAN P. AMESBURY,<br>    Plaintiff,<br><br>    v.<br><br>PAUL MANNING, *individual capacity*;<br>JAMES GIVEN, *individual capacity*;<br>HANNAH BURNES, *individual capacity*;<br>DAVID GOLDSTEIN, *individual and official capacity*; PAWTUCKET FIRE DEPARTMENT; JEFFERY JOHNSON, *individual and official capacity*; JAMES CAMBIO, *individual capacity*; TIMOTHY MCLAUGHLIN, *individual capacity*; DONALD R. GREBIEN, *individual and official capacity*; WILLIAM SISSON, *individual and official capacity*; BARBARA PACHECO, *individual and official capacity*; DIRECTOR JAMES GUMBLEY, *individual capacity*,<br>    Defendants. | C.A. No. 24-cv-257-JJM-AEM |

ORDER

This is one of many cases that either Brian Amesbury or his father, Mark Amesbury,[1] have filed stemming from their interactions with the Pawtucket Fire Department ("PFD") and the State Fire Marshal's Office regarding his father's building located at 110 Tweed Street in Pawtucket, Rhode Island, where Brian allegedly rents two units. Mr. Amesbury filed his Second Amended Complaint ("SAC") alleging thirteen claims, all under 42 U.S.C. § 1983, for acts occurring

---

[1] Brian's claims are nearly identical with those in Mark's pending lawsuit, *Mark Amesbury v. Pawtucket, et al.*, C.A. 21-cv-409-JJM-LDA.

between June 30, 2021 through August 19, 2021, against the PFD, former Fire Chief William Sisson, former Fire Marshal David Goldstein, Lieutenant Jeffrey Johnson, Mayor Donald R. Grebien, and former Assistant to Defendant Sisson, Barbara Pacheco ("Pawtucket Defendants"). Mr. Amesbury also sued several state actors from the State Fire Marshal's Office including Investigator Paul Manning, James Given, and Hannah Burnes, Former Chief Deputy James Gumbley, State Fire Marshal Timothy McLaughlin, and Building Code Commissioner James Cambio, all in their individual capacities only ("State Defendants").[2]

Mr. Amesbury alleges he was subjected to unreasonable searches and violations of his due process rights under the Fourth and Fourteenth Amendments. Before the Court are two Motions to Dismiss the entire SAC. ECF Nos. 36, 37.

## I. BACKGROUND

There are two separate, but related searches implicated in the SAC–the first in June and the second in August, both in 2021. Mr. Amesbury alleges that, on June 30th, Lt. Johnson and three other Pawtucket firefighters entered the building, pulled the fire alarm, and then searched his rental units without a warrant. Chief Sisson confirmed that Lt. Johnson pulled the alarm and stated that PFD went to the

---

[2] All Defendants argue at the outset of their motions that the Court should dismiss the case because the SAC does not comply with Rule 8's requirement that complaints contain a short plain statement sufficient to put the defendant on notice of wrongdoing and to show that the plaintiff is entitled to relief. Fed. R. Civ. P. 8(a). While the Court agrees with the contention that Mr. Amesbury's SAC is unorganized, scattershot, and many of his allegations are unclear and conclusory at best, it finds that it is more prudent to take a careful and close look at Mr. Amesbury's allegations as to each Defendant and provide a substantive disposition, instead of a procedural one.

building to see if it was occupied and to see if the fire alarm system worked. Mr. Amesbury alleges that Fire Marshal Goldstein directed this search in retaliation for his reporting that the fire doors at Jenks Middle School were locked in violation of the Fire Code. Mr. Amesbury also alleges that the search was done in retaliation for his father's failure to pay the radio master box annual fee and for interfering with City Fire Marshal Goldstein's job.

Before the August search, Mr. Amesbury and his father sent a series of emails to both Pawtucket and State actors, highlighting the Amesburys' concerns about the June search and raising more concerns and objections to city and state involvement with their building and rental units.

On August 19th, Fire Marshal Goldstein, and State Investigators Manning, Given, and Burnes went into the building and rental units with an administrative warrant. Mr. Amesbury alleges that his rental units were wrongfully searched because the warrant was not valid. Citing to only one line of a multi-page document, he alleges that the warrant allowed a search "for the purposes of determining the origin and cause of the fire." ECF No. 37-1 at 23.[3] Because there was no fire, the warrant was not valid, and the ensuing search was unconstitutional.

---

[3] In his SAC, Mr. Amesbury cites extensively to the August 2021 application and warrant. The State Defendants attached the application, warrant, and affidavit in support to their motion, which was produced in Mark Amesbury's suit against these same defendants. *See Amesbury v. Sisson*, C.A. No. 21-409. Typically, "any consideration of documents not attached to the complaint, or not expressly incorporated therein, is forbidden, unless the proceedings are properly converted into one for summary judgment under Rule 56. However, "courts have made narrow exceptions for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiff's claim; or for documents

3

## II. STANDARD OF REVIEW

In reviewing a motion to dismiss under Federal Rules of Civil Procedure Rule 12(b)(6), the Court must "accept as true all well-pleaded facts set forth in the complaint and draw all reasonable inferences therefrom in the pleader's favor." *Artuso v. Vertex Pharm., Inc.*, 637 F.3d 1, 5 (1st Cir. 2011). It "augment[s] these facts and inferences with data points gleaned from documents incorporated by reference into the complaint, matters of public record, and facts susceptible to judicial notice." *Haley v. City of Bos.*, 657 F.3d 39, 46 (1st Cir. 2011) (citing *In re Colonial Mortg. Bankers Corp.*, 324 F.3d 12, 15 (1st Cir. 2003)).

A complaint need contain only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Although "detailed factual allegations" are not necessary, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), the complaint must "contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). The complaint must include "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "If the factual allegations in the complaint are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere

---

sufficiently referred to in the complaint." *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993). Because the administrative application and warrant are so central to Mr. Amesbury's SAC and arguments in objection to Defendants' motions, the Court will consider them.

conjecture, the complaint is open to dismissal." *S.E.C. v. Tambone*, 597 F.3d 436, 442 (1st Cir. 2010) (citing *Twombly*, 550 U.S. at 555)).

## III. DISCUSSION

Mr. Amesbury brings his claims under 42 U.S.C. § 1983. "[T]o maintain a section 1983 action, the conduct complained must be committed by a 'person' acting under color of state law and the conduct must have deprived the plaintiff of a constitutional right or a federal statutory right." *Figueroa v. DiNitto*, C.A. No. 01-137 T, 2002 WL 553720, at *2 (D.R.I March 14, 2002) (citing *Gomez v. Toledo*, 446 U.S. 635, 640 (1980)). While there has been much litigation about these events, when taken down to brass tacks, this case is about whether the Pawtucket and State Defendants' conduct surrounding the June and August 2021 property searches was reasonable and done within the parameters of the law. Because all Defendants move to dismiss all the claims against them under the doctrine of qualified immunity, and this defense should be considered sooner than later in litigation, the Court will start there. *See Haley*, 657 F.3d at 47–48 (finding that the qualified immunity defense can be raised and evaluated at the motion to dismiss stage).

### A. Qualified Immunity

Qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). This defense protects all state actors except "the plainly incompetent [and] those who knowingly violate the

5

law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). It does not, however, "shield public officials who, from an objective standpoint, should have known that their conduct was unlawful." *Pagán v. Calderón*, 448 F.3d 16, 31 (1st Cir. 2006) (citing *Davis v. Scherer*, 468 U.S. 183, 193 (1984)). In considering this defense, the Court follows a two-part inquiry: first, it asks, "whether the facts that a plaintiff has alleged … make out a violation of a constitutional right." *Pearson*, 555 U.S. at 232. Next, it considers "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

"When a public official asserts a qualified immunity defense, he may be held liable for violating a constitutional right only if '[t]he contours of the right [are] sufficiently clear [such] that a reasonable official would understand that what he is doing violates that right.'" *Haley*, 657 F.3d at 47–48 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). This requires considering "whether the contours of the right would have been 'sufficiently well-defined at the critical time' and, if so, 'whether it would have been clear to an objectively reasonable official, situated similarly to [the defendants], that the actions taken or omitted contravened the clearly established right.'" *Id.* (quoting *Limone v. Condon*, 372 F.3d 39, 48 (1st Cir. 2004)). *Pearson* instructs that these two steps do not have to be considered sequentially so the Court will consider the second step first, that is, whether it would have been clear to a reasonable Pawtucket and/or State official that the warrantless search in June and/or the administrative warrant search in August violated a clearly established constitutional right.

6

1. June Search–Claims 1, 2, 3, 4, 13, and 14

Mr. Amesbury's claims about the June search only pertain to Lt. Johnson, City Fire Marshal Goldstein, and Ass't Pacheco. Mr. Amesbury alleges in Claims 1, 2, 3, 4, 13, and 14 that Lt. Johnson violated his Fourth and Fourteenth Amendment rights when he entered the building and then his rental units, pulled the fire alarm, walked around for a short period of time, and left. He alleges that City Fire Marshal Goldstein "searched" his units when he was standing outside the units with a walkie-talkie. He alleges that Ass't Pacheco wrongfully initiated the search. Lt. Johnson counters that he was acting within his statutory duties under R.I. General Laws § 23-37-1, which allows him to go into buildings under certain circumstances. He also argues that qualified immunity applies here. City Fire Marshall Goldstein and Ass't Pacheco argue they did not search the property; he did not enter the building, and she was not present at all that day.

The Fourth Amendment of the United States Constitution protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Whether a warrantless search is reasonable is based on "a careful balancing of governmental and private interests." *New Jersey v. T.L.O.*, 469 U.S. 325, 341 (1985). The Court must "'assess[], on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Alasaad v. Mayorkas*, 988 F.3d 8, 16 (1st Cir. 2021) (quoting *Riley v. California*, 573 U.S. 373, 385 (2014)).

Fire safety is a priority in Rhode Island and a legislated government interest. Section 23-37-1 provides Rhode Island firefighters with right of entry:

> The chief, chief engineer, assistant engineer, captain, lieutenant, or any other executive officer of any volunteer fire company, association, fire district company, or any other organization organized or created for the purpose of extinguishing fires and preventing fire hazards, whether it is incorporated or not, and whether it is a paid department or not, when on duty at a fire in the city or town where the fire headquarters or station of the company, association, or organization is located or in response to an alarm for such a fire shall, in the absence of the chief of police, have the power to suppress any tumult or disorder and to command from the inhabitants of the city or town all needful assistance for the suppression of fires and in the preservation of property exposed to fire; *the officers above enumerated shall also have authority to go onto and enter any property or premises and to do whatever may reasonably be necessary in the performance of their duties while engaged in the work of extinguishing any fire or performing any duties incidental thereto.*

R.I. Gen. Laws § 23-37-1 (emphasis added); *see also* R.I. Gen. Laws § 23-28.2-20 ("shall have the authority to enter at any reasonable hour, any building, structure, or premises in the state to enforce the provisions of the Fire Safety Code").

In this case, it was not clear to Lt. Johnson that he was violating Mr. Amesbury's clearly established Fourth Amendment rights by responding to the property in June in response to Fire Code violations and other safety concerns. *Vaill v. Franklin*, 722 A.2d 793, 794-95 (R.I. 1999). Lt. Johnson went to Mr. Amesbury's building because of PFD concerns that bills were returned to the PFD as "undeliverable" and fire alarm inspections were overdue. He entered the building as state law permits, tested and reset the system to ensure that it worked properly. Lt. Johnson spoke with other tenants, confirming occupancy, obtained Mr. Amesbury's contact information, and left the building. Mr. Amesbury

8

acknowledges that Lt. Johnson went to the property to inspect the building in response to his father's failure to pay the fire alarm bills. There is no dispute that protection of public health and safety are reasonable government interests. Because he acted reasonably within the government's interest, he did not violate a clearly established Fourth Amendment right by entering the building in June while acting within his duties as a firefighter to prevent fire hazards and ensure a functioning fire alarm system in accordance with R.I. Gen. Laws § 23-37-1. The Court finds Lt. Johnson is protected by the doctrine of qualified immunity.

As for Ass't Pacheco and City Fire Marshal Goldstein, Mr. Amesbury does not allege that Ass't Pacheco was present at all that day and does not allege that City Fire Marshal Goldstein entered the building so their conduct did not violate his constitutional rights. *See Figueroa*, 2002 WL 553720 at *2. Because the SAC fails to allege any involvement City Fire Marshal Goldstein or Ass't Pacheco had in "searching" the property or his rental units, Mr. Amesbury's claims against them are dismissed for failure to state a claim.

There is also a retaliation aspect to Mr. Amesbury's claims in 13 and 14–he alleges that Lt. Johnson, City Fire Marshal Goldstein, and Ass't Pacheco searched the building and his units in retaliation for not paying a bill, reporting Fire Code violations at Jenks Middle School, and for interfering with City Fire Marshal Goldstein's work as Pawtucket Fire Marshal. Defendants move to dismiss.

For Mr. Amesbury's retaliation claim to withstand a motion to dismiss, he must first allege that his conduct is constitutionally protected. *Powell v. Alexander*,

9

391 F.3d 1, 17 (1st Cir. 2004). Defendants concede that his reports about the chained fire doors at Jenks[4] are protected activity. Next, he must allege that this conduct was a "'substantial factor'…a 'motivating factor' for the alleged retaliatory decision. The defendant may then avoid a finding of liability by showing that 'it would have reached the same decision ... even in the absence of the protected conduct.'" *Id.* (quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). So the Court considers whether the June search would not have happened "but for" Mr. Amesbury's reports about the Fire Code violations at Jenks.

First, no allegations link Mr. Amesbury's report about the fire door to the June search. He admitted that his father had not paid a radio master box annual fee and lists multiple contacts he and his father had with PFD before the June search related to the property and its deficiencies relative to the Fire Code. ECF No. 35 ¶¶ 26-27. He acknowledges that Chief Sisson identified two reasons that PFD personnel went to the property–to see if the property was occupied and to test the fire alarm system. *Id.* While he does not believe that those concerns were legitimate, they are statutorily allowed and justified PFD presence at the property. Moreover, Mr. Amesbury acknowledges that he was not the only rental unit occupant that was inspected that

---

[4] The Court agrees with Defendants that the other two grounds Mr. Amesbury cites as reasons for retaliation are not constitutionally protected. Mr. Amesbury also alleges that the State Fire Marshal's office retaliated against him because it did not properly respond when he reported that one of the tenants in a different building was operating an illegal nightclub. Someone showed up at the building, but Mr. Amesbury alleges that they did not do the proper tests. It is unclear from the SAC when this occurred and who specifically he alleges is implicated in these allegations. It is also unclear what the protected activity is; as such, the Court dismisses these retaliation allegations based on this reporting.

10

day; PFD employees entered multiple units in the property, not just his, in an effort to determine occupancy and potential code violations. *Id.* ¶ 16. He fails to allege any connection between his reports about locked fire doors and the June search. Therefore, his retaliation claim does not plausibly allege causation.

Second, while close temporal proximity between protected activity and retaliation may give rise to an inference of causal connection, here, the report and the search occurred many months apart. Mr. Amesbury alleges that he received a phone call in March 2020 from City Fire Marshal Goldstein who was upset that he reported the fire door issues at Jenks. It is unclear when Mr. Amesbury made that report, but the Court can infer that it was early in 2020, perhaps before. The search occurred in June 2021, over twelve months later, a period that is "simply too long to support such an inference." *Centro Medico del Turabo, Inc. v. Feliciano de Melecio*, 406 F.3d 1, 11 n.5 (1st Cir. 2005) (twelve to eighteen months) (citing *Lewis v. City of Bos.*, 321 F.3d 207, 219 (1st Cir. 2003) (eighteen months); *Dressler v. Daniel*, 315 F.3d 75, 79–80 (1st Cir. 2003) (two years); *Lewis v. Gillette Co.*, 22 F.3d 22, 25 (1st Cir. 1994) (two years); *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 828 (1st Cir. 1991) (nine months)). Therefore, the Court cannot infer a causal connection, or a finding of unlawful retaliatory conduct based on temporal proximity alone. Claims 1, 2, 13, and 14 are dismissed.

### 2. August Search

Claims 5 through 12 relate to the August 19th search. Mr. Amesbury alleges in Claims 5, 6, 7, and 8 that City Fire Marshal Goldstein, State Investigator Manning, Mr. Givens, and Ms. Burnes searched his rental units in violation of the Fourth and

11

Fourteenth Amendments because the purpose of their search was not allowed by the warrant's terms, invalidating it. He also alleges that Defendants did not give him the "real" warrant because they were hiding it from him and his father. Claims 9, 10, 11, and 12 are based on a supervisory liability theory against certain Pawtucket and State actors; Mr. Amesbury alleges that Mayor Grebien and Chief Sisson as City Fire Marshal Goldstein's supervisors, and State Fire Marshal McLaughlin, State Chief Deputy Gumbley, Commissioner Cambio, as supervisors of Mr. Given, State Investigator Manning, and Ms. Burnes knew that their direct reports intended to search the property and his rental units because Mr. Amesbury and his father had sent them emails and knew or reasonably should have known that their direct reports' conduct would deprive him of his constitutional rights and failed to stop them from engaging in such conduct.

Mr. Amesbury's main issue with the warrant is not its technical validity; he acknowledges that a Magistrate Judge signed it, and it included an affidavit. A myopic reading of the warrant and accompanying application and affidavit drives his theory here. He argues that it is invalid because there is a line stating it was issued for the purpose of determining the origin and cause of the fire. ECF No. 35 ¶ 41. He alleges that State Investigator Manning lied to the magistrate that

> "there was a fire to investigate to get the warrant. But Magistrate O'Neil outsmarted Manning and only issued the warrant 'for the purpose of determining the origin and cause of the fire.' And since they all knew that there was [no] fire to investigate therefore no valid search warrant that they could reasonabl[y] rely on and no valid reason to enter and search the building. This was a wrongful search of both the building and my (Brian Amesbury) two areas of the building."

*Id.* ¶ 42.

The Court first steps back to recount the warrant process here given the warrant documents referenced in the SAC. State Investigator Manning, under his statutory authority to "enter at any reasonable hour, any building, structure, or premises in the state to enforce the provisions of the Fire Safety Code," sought and obtained an administrative search warrant. R.I. Gen. Laws § 23-28.2-20(a)-(a)(1). As the applicant, State Investigator Manning affirmed that he had a reasonable interest in monitoring the building owner's compliance with statutory or regulatory authority. ECF No. 37-1 at 22. The administrative search warrant attached to the application stated that the property was to be searched for "[e]vidence of Fire Code violations and compliance to the Fire Code as it relates to the current occupancy and hazard classification, condition and maintenance of fire protection systems and features, condition and maintenance of life safety systems and features, means of egress components, building service equipment and features, interior finish, content, furnishings, operating features, and protections from hazards." *Id.* at 23. The affidavit included with the application noted that a search was required because, while a third-party electrical contractor inspected the fire alarm system the month before, the State Fire Marshal did not have records that the sprinkler system had been tested. It also noted that "the last fire safety inspection of the entire building was conducted in 2017." *Id.* at 25. PFD attempted several times to access the building to perform the mandated inspections, were unsuccessful and so requested

13

assistance from the State Fire Marshal and obtained an administrative warrant to search the entire building. *Id.*

In deciding whether the Pawtucket and State Defendants are entitled to qualified immunity, the Court considers whether the State's interest in enforcing the provisions of the State's Fire Code, was "a reasonable governmental interest." *Camara v. Mun. Court of San Francisco*, 387 U.S. 523, 539 (1967). There is no dispute that enforcement of the State Fire Code and resulting protection of public health and safety are reasonable government interests. And the warrant itself was limited in scope, defined the parameters of the search, and targeted to the purpose Defendants articulated. Thus, the Court finds that it would not have been clear to Defendants that their conduct in getting the warrant and entering the building and rental units within the parameters set forth in the warrant violated Mr. Amesbury's Fourth Amendment rights.

Moreover, the deficiency Mr. Amesbury harps on–that there is one line in the warrant that states that the purpose of the search is to identify a fire–does not defeat Defendants' authority to search pursuant to a signed administrative warrant. First, that line was part of a pre-printed form, and the rest of the application, warrant, and affidavit clearly articulated that the property needed to be searched due to Mr. Amesbury's failure to comply with the Fire Code. Second, even if that one reference to a fire invalidated the entire application and warrant, it was facially valid. Mr. Amesbury acknowledges in the SAC that the warrant was signed and accompanied by a signed affidavit. Officers relying objectively and reasonably on a

14

facially valid warrant are permitted to search even when a warrant is invalid or quashed. *Brady v. Dill*, 187 F.3d 104 (1st Cir. 1999); *Whiting v. Kirk*, 960 F.2d 248, 251 (1st Cir. 1992).

In this case, it was unclear to the Pawtucket and State Defendants that they were violating Mr. Amesbury's clearly established Fourth Amendment rights by entering the property and his rental units because they were acting in accordance with a valid, or at least facially valid, administrative warrant and backed by state law that allows them to enter property to ensure it complies with the Fire Code. All Defendants–both city and state actors and their supervisors–are protected by the doctrine of qualified immunity for Claims 1, 2, 5, 6, 9, 10, 13, and 14.

## IV. CONCLUSION

Pawtucket and State Defendants acted reasonably and within their statutory duties to ensure compliance with fire safety codes, including their duty to enter property to inspect fire safety systems. Because all Defendants are entitled to qualified immunity, Mr. Amesbury's SAC fails to state claims upon which relief can be granted. The Court GRANTS both Motions to Dismiss on all claims. ECF Nos. 36, 37.

IT IS SO ORDERED.

*s/John J. McConnell, Jr.*

_____
John J. McConnell, Jr.
Chief Judge
United States District Court

June 30, 2025